[713 NYS2d 712]

In the Matter of BARBARA S. PREISKEL et al., as Trustees under the Laura Spelman Rockefeller Memorial Trust.

COMMUNITY SERVICE SOCIETY OF NEW YORK, Respondent-Appellant, v NEW YORK COMMUNITY TRUST et al., Appellants-Respondents.

First Department, September 21, 2000

### APPEARANCES OF COUNSEL

*Philip L. Graham, Jr.,* of counsel (*Henry Christensen, III, Charles T. Dowling* and *Christine C. Monterosso* on the brief; *Sullivan & Cromwell,* attorneys), for respondent-appellant.

*Roy L. Reardon* of counsel (*Russell E. Brooks, David R. Gelfand, Charles Westland, Mildred Kalik* and *Victoria B. Bjorklund* on the brief; *Milbank, Tweed, Hadley & McCloy, L. L. P.,* and *Simpson Thacher & Bartlett,* attorneys), for New York Community Trust and others, appellants-respondents.

*Marla G. Simpson* of counsel (*Eliot Spitzer, Attorney General* of the State of New York, attorney), for Ultimate Charitable Beneficiaries, appellant-respondent.

*Malvin E. Bank* of counsel (*James C. Koenig* and *Michael J. Levin* on the brief; *Thompson Hine & Flory, L. L. P.,* and

*Menaker & Herrmann, L. L. P.,* attorneys), for Chicago Community Trust and others, *amici curiae.*

*Florence A. Davis* for Starr Foundation, *amicus curiae.*

*John M. O'Connor* of counsel (*Mark Weldon* and *Stephanie H. Scherby* on the brief; *DeForest & Duer,* attorneys), for National Committee for Responsive Philanthropy and another, *amici curiae.*

*Gregory L. Diskant* of counsel (*Rochelle Korman, Robert W. Lehrburger, Nicole Tell* and *John A. Edie* on the brief; *Patterson, Belknap, Webb & Tyler, L. L. P.,* attorneys), for Council on Foundations, *amicus curiae.*

## OPINION OF THE COURT

ANDRIAS, J.

These cross appeals present issues of whether the Surrogate correctly found that the Distribution Committee of the New York Community Trust (collectively, Community Trust) had abused its discretion in exercising its variance powers to terminate specific bequests to the Community Service Society of New York (CSS); whether a six-year Statute of Limitations should apply to this proceeding: whether CSS's claims are barred by laches; and whether the Community Trust should have notified the Attorney General of its intention to discontinue the payment of such bequests.

Community Trust was founded in 1924 as a community foundation to administer charitable funds established with gifts from donors, primarily for the benefit of New York City residents. It is tax exempt and is the largest community foundation in the United States. In 1994, it distributed nearly $51,000,000 in grants to more than 3,000 charitable organizations. Its governing document is the "Resolution and Declaration of Trust creating 'The New York Community Trust.'" (Trust Resolution.) A donor who wishes to create a fund with Community Trust must adopt and incorporate all of the provisions of the Resolution in the instrument of transfer.

CSS is a 155-year-old, not-for-profit corporation, which provides "support and empowerment and direct relief to poor people within the City of New York." The assistance comes in the form of direct services such as counseling, relief by way of clothing and food allowances and camping programs, research and advocacy, as well as working with community-based groups.

Donors to Community Trust have the options of making unrestricted gifts for general charitable purposes, creating a fund

from which the income will be devoted to a designated charitable organization, or creating a "field-of-interest" fund which specifies the nature of the charity to be funded, but not designating any particular organization.

Most germane to the issues on this appeal is the following clause in the Trust Resolution, which describes the circumstances under which Community Trust may exercise its variance power, that is, the power to make dispositions which conflict with the donor's pronounced intentions: "Among the provisions so to be adopted shall be the following, viz.: that any such expressed desire of the donor shall be respected and observed, subject, however, in every case to the condition that if and whenever it shall appear to the Distribution Committee hereinafter referred to that circumstances have so changed since the execution of the instrument containing any gift, grant, devise or bequest as to render *unnecessary, undesirable, impractical or impossible* a literal compliance with the terms of such instrument, said Committee may at any time or from time to time direct the application of such gift, grant, devise or bequest to such other public educational, charitable or benevolent purpose as, in their judgment, will most effectually accomplish the general purpose * * * without regard to and free from any specific restriction limitation or direction contained in such instrument" (emphasis supplied).

At issue in this litigation are six trusts created by their donors as designated funds, in which CSS was specifically designated as one of the income beneficiaries.

In 1970, Community Trust commenced a review of its procedures with regard to funding of various charities. CSS claims that the motivation for this review was a desire to eliminate as much as possible the designated funds and expand Community Trust's discretion with regard to the distribution of funds. Community Trust claims that the impetus for the review was the Tax Reform Act of 1969, which made clear that charitable foundations where the donors exercised inordinate control over the distribution of monies ran the risk of losing tax-exempt status. While the impact of the Tax Reform Act of 1969 was purportedly the subject of much speculation at meetings of the Trust's Distribution Committee between 1970 and 1977, there does not appear to be anything in the record which confirms that the Trust ever was threatened by the Internal Revenue Service (IRS) with the loss of tax-exempt status, or that the IRS determined that the amount of donor-designated funds had to remain below a certain percentage.

In any event, the review process resulted in the Distribution Committee sending a letter in the spring of 1970 to the designated beneficiaries, requesting that each beneficiary provide the Trust with a financial report, a statement of what the organization had accomplished in the prior three years with the funds provided by the trust, and a statement detailing why the organization should continue to receive funds "instead of making this money available for meeting the urgent needs of other charitable organizations coping with today's charitable problems." The minutes of the November 1970 meeting of the Distribution Committee then reflect a discussion concerning termination of beneficiaries. It apparently was decided that rather than abrupt termination, a designated beneficiary could be moved to an intermediate status, where its payments would be suspended, but it would be given the opportunity to submit further evidence for continuance. Even being placed on intermediate status would, however, require approval in two successive meetings of the Committee.

Coincidentally, during the same period of time, CSS had been conducting its own decennial study of its programs to decide how it could more effectively fulfill its purposes. That study resulted in a report of its Study Committee, dated January 27, 1971. One outcome of this study was a decision to change how services were provided. Instead of requiring individuals in need of assistance to make an appointment to come to one of its four offices, it was decided to move operations into community groups that were already in existence, such as transient hotels, hospitals and housing projects. The most obvious result was that assistance would no longer always be directly provided by CSS, but could be channeled through existing community-based organizations.

At some point, Community Trust reviewed its contributions to CSS and took note that CSS was to be transformed from a social services agency to one sharing power with community-based organizations. However, at trial, Community Trust conceded that CSS did not abandon all direct service to individuals.

In February 1971, the "Designated Grants Sub-Committee" of the Distribution Committee recommended, *inter alia*, that the word "undesirable" in the Trust Resolution be interpreted in the light of changed conditions, "particularly how current conditions relate to those existing at the time of the donor's request." The subcommittee suggested that conditions may have changed as a result of a difference in focus of the opera-

tions of the designated beneficiary, other organizations providing the same services, the need for the services having declined, or a substantial increase in financial support from other organizations. The subcommittee also suggested that "in case of doubt the Distribution Committee should continue making payments until its doubts are satisfied."

In the same report, however, it was recommended that further payments to CSS should be suspended, "pending clarification of its new role, and how it contrasts with the operations which interested various founders." This report was adopted by the full Distribution Committee on March 19, 1971. The minutes of that meeting state: "Designated payments to Community Service Society will be temporarily deferred until the program changes of the Society have been learned and the Committee is assured that the Society is still in a position to use these funds in the manner intended by their donors."

Shortly thereafter, Barbara Grants, the Community Trust employee originally involved in the review process, actually reviewed the CSS decennial report, although the initial suspension of grants had apparently been based upon an article in the New York Times, describing the proposed changes at CSS as a "Copernican revolution." She testified that, after reading the report, she believed that Community Trust should continue working with CSS, although she clearly did not believe that the change in direction by CSS was appropriate for some of the funds. She prepared a report, dated April 6, 1971, which stated in pertinent part: "From this document [the CSS study] *it appears unlikely that we could continue to make grants to CSS based on its direct service to individuals. But, if these funds were discretionary rather than designated, we would most likely make grants to CSS based on its excellent program and projects*" (emphasis in original). The report itself was apparently not submitted to the full Distribution Committee, but was given to, *inter alia*, Herbert West, at the time the Director of Community Trust. According to CSS, West was the champion of the elimination of designated funding in favor of a more unfettered approach. Nevertheless, Grants testified that the subject of the report was discussed at many subsequent meetings of the entire Distribution Committee.

At a meeting on September 17, 1971, the Distribution Committee formally revoked the grant program of the six trusts, resulting in their transformation into "semi-designated fund[s] for the improvement of health and welfare in New York City." At the same meeting, however, a discretionary grant of

$160,000 to CSS, payable over three years, was authorized, for CSS's work at the Jose de Diego-Beekman Houses. A letter to that effect was sent to CSS by Joseph West on September 20th. The letter did not inform CSS that the Trust was terminating the designated payments, although the minutes of the meeting expressed the wish that the recipients of annual grant payments be notified that the Trust would consider future grant proposals from them. CSS continued to receive grants from Community Trust for some of the years between 1971 and 1995, but they apparently were discretionary, and in response to proposals submitted by CSS. It is also noteworthy that CSS received no grants from the six trusts involved between 1984 and 1992, apparently because it did not apply for any moneys, or because funds came from other trusts.

At its September 1971 meeting, the Distribution Committee also voted to reallocate distributions from another trust under its management, the Sidney S. Prince Trust. The Prince Trust had been created by a testatrix who died in 1960, and its terms provided that 5% of its income was to be distributed to CSS. The reallocation terminated payments to CSS. On March 25, 1972, Dr. Saul Scheidlinger, a nephew of the creator of the Prince Trust, wrote a letter to Community Trust, inquiring about how much had been distributed to CSS from the Prince Trust. By letter dated March 29, 1972, Community Trust responded with a recitation of the amounts for 1964 through 1971, and stated that it anticipated that the grant to CSS for 1972 would be slightly smaller than the previous year. No mention was made of Community Trust's prior decision to terminate designated payments from the Prince Trust to CSS. On July 27, 1972, the Distribution Committee approved a $650 grant from the Prince Trust to CSS. The minutes acknowledge that Community Trust had intended to discontinue the designated grant, "but in view of the fact that Dr. Saul Scheidlinger is still living and feels deeply about its continuance, this designated grant was re-instated."

In 1993, CSS ascertained, after receiving a copy of a bank advice from Chemical Bank, that there was an account in its name from which it was not receiving funds. CSS representatives began discussions with Community Trust that ended unsatisfactorily. A February 6, 1995 letter was sent by counsel for the Trust to counsel for CSS, stating, in relevant part, that the Distribution Committee had exercised its variance power in 1971 after a "thorough review of the situation," and claiming that the decision was communicated at the time to the Ex-

ecutive Director of the Community Service Society as well as to the Chairman of its Board of Trustees.

By petition dated September 22, 1995, CSS sought to compel an intermediate accounting for the period 1928 to date, and to direct distribution of designated fund income. It also called for Community Trust to provide information concerning other trusts which it administered, and in which CSS was an eligible beneficiary.

After a trial, the Surrogate issued a decision, dated October 15, 1999, and an order, entered November 9, 1999, which directed an accounting for the period from 1989 to the present.

In so ruling, the Surrogate found that the review process undertaken by Barbara Grants subsequent to the initial suspension of the CSS designated grants was comprised of three components. Ms. Grants reviewed the information submitted by the designated beneficiary, asked outside parties for information, and reviewed the historical files of Community Trust with regard to both the beneficiary and the creation of the particular trust. The Surrogate observed that Ms. Grants testified that she had met with Anne Poling, the General Director of CSS, in the summer of 1971 concerning an operating deficit, and also that Ms. Grants had reviewed the CSS decennial report itself. The Surrogate then found: "The Distribution Committee held bi-monthly meetings which lasted less than two hours including lunch, and were not limited to discussions concerning CSS," but acknowledged that Ms. Grants, who was in attendance at the meetings, "testified that the decision about CSS consumed much of the discussion throughout the 1971 March-September period."

Observing that there was a dearth of authority in New York or elsewhere concerning a community foundation's discretion in applying whatever standard governs the exercise of the variance power, the Surrogate found that, in the absence of guidelines, such decision "should reflect a policy that maximizes the utility of community foundations to provide donors with the option of making their own choices of beneficiaries, while preserving the efficacy of their gifts should later circumstances undermine that choice." This, she found, requires balancing deference to the foundation's expertise with the expectations of the donors, and compels restraint by the court in substituting its own judgment. "Furthermore, the variance power must be broad enough to give undesirability a meaning independent of impossibility, impracticability or lack of necessity," otherwise, the court found, the variance power could be exercised in only

the most extreme circumstances. Nor, it opined, could the power be so broad as to permit a community foundation to ignore donors' wishes without restraint.

The Surrogate concluded that a finding of undesirability "must be grounded in a change of circumstance that negatively affects the designated charity to such a degree that it would be likely to prompt a donor of the fund to re-direct it." She went on to say that if the foundation uses such standard, the courts must afford its decision maximum deference in review.

The Surrogate then opined that although Community Trust was not negligent in its review of the facts surrounding CSS's change in direction in 1971, the surviving record indicates that the Trust held CSS in high esteem. She noted that a discretionary grant was awarded to CSS on the same day that the designated grants were terminated, and that the Distribution Committee reinstated CSS as a beneficiary of the Prince Trust after receiving an inquiry from Dr. Scheidlinger. Such actions, she found, were "inconsistent with the contention that the changes at CSS were undesirable." The court also observed that speculative alternatives for terminating the funding, such as unionization at CSS, its operating deficit, its large endowment, and the increase in governmental "Great Society" spending, would not justify the exercise of the variance power.

With regard to the Statute of Limitations, the Surrogate referred to her June 7, 1996 decision, wherein she had specifically addressed the issue. She noted that the record in 1996 (before discovery had been completed) had established that "CSS had notice of the [Community Trust's] repudiation of the status of CSS as beneficiary entitled to a specified percentage of the income of the funds at issue here, but that the notice fell short of conveying to CSS notice of a complete termination of its interests." The Surrogate went on to observe that the trial evidence buttressed its prior conclusions: "Furthermore, the substantial discretionary grants received by CSS after exercise of the variance power, its reinstated entitlement under one trust and unchallenged continuation under another, demonstrates that CSS was justified in understanding that its new position, while not as good as its prior status, was preferential to that of other charities. These transactions muddled the message of an otherwise clear repudiation, and thus there was no effective repudiation * * *. Accordingly, the statute of limitations does not bar the claims here for the period six years prior to the commencement of this proceeding."

The Surrogate also concluded that since CSS was not aware of the complete repudiation, the defense of laches was not avail-

able to Community Trust. As a result, an accounting within 120 days was ordered.

A stay of compliance with the decree pending final determination of the appeal by this Court was directed by the Surrogate on January 5, 2000.

Community Trust appeals from that portion of the Surrogate's decree which ordered it and Chase Manhattan Bank to judicially settle their accounts as trustees of five trusts (the Rockefeller trusts), and ordered Community Trust and Bankers Trust Co. to judicially settle their account, as trustees of a sixth trust (the Griffith trust), for the period running from October 13, 1989 to the date of the decree; ordered that the Statute of Limitations did not bar the claims of CSS within the six years prior to the commencement of the proceeding; and ordered that the doctrine of laches did not bar the claims.

CSS cross-appeals from the decree to the extent that it bars its claims accruing more than six years prior to the date CSS filed its petition.

The Attorney General, on behalf of unnamed ultimate charitable beneficiaries, appeals from the decree to the extent it establishes a six-year limitations period for accountings, and "further to the extent that [the decree] address[es] the procedural and substantive standards applicable to the exercise of the variance powers set forth under the trusts instruments at issue."[1]

Amicus curiae briefs have been filed by the National Committee for Responsive Philanthropy, the National Network of Grantmakers, and the Starr Foundation in support of the position espoused by CSS and the Attorney General; and by The Community Foundations and the Council on Foundations in support of the position advocated by Community Trust.

■ Community Trust argues that the Surrogate improperly found that there had been an abuse of discretion by the Distribution Committee since the termination was undertaken after a thorough review, prompted by the CSS change in approach to servicing the poor and needy, whereby it would share power with community groups rather than provide direct services. It claims that the Distribution Committee inquired into whether

---

1. One or more of the appellants also appeals from the decision upon which the decree is based, dated October 15, 1999, from an order of the Surrogate entered August 13, 1996, and the decision upon which it was based, dated June 7, 1996. To the extent the decisions and/or orders are appealable, review of same is subsumed within review of the appeal from the final decree (CPLR 5501 [a]).

there had been a change of circumstances, and noted that there had been an increase in governmental assistance for the poor, along with the change to a community-based direction.

This Court has addressed the law with regard to trust interpretation: "In interpreting a trust, courts must look to the intent of the settlor as expressed in the trust instrument [citation omitted]. A court cannot look beyond the trust instrument where the donor's intent is expressed in clear and unambiguous terms." (*Mercury Bay Boating Club v San Diego Yacht Club*, 150 AD2d 82, 90, *affd* 76 NY2d 256.)

The Court of Appeals reiterated that "the trust instrument is to be construed as written and the settlor's intention determined solely from the unambiguous language of the instrument itself" (76 NY2d, at 267 [citations omitted]). The counterpoint to this requirement that there be literal reading is that where a trustee has discretionary power, the exercise of that power is not to be the subject of judicial interference, "at least if exercised reasonably and in good faith" (*Matter of Davis*, 54 Misc 2d 1065, 1073).

Thus, a reconciliation between the provisions of the Community Trust Resolution and the terms of the wills at issue is necessary. The Trust Resolution gives the Trust discretion to use its variance power where circumstances have changed and execution of the instrument containing any gift may be, *inter alia*, "undesirable." On the other hand, the wills designate CSS or its predecessors as beneficiaries.

For instance, paragraph "First" of the 1929 Williams will provides that the testator's largesse shall be bestowed for "the material relief of such poor persons" as may be designated as appropriate beneficiaries by CSS's predecessor, The Charity Organization Society of the City of New York. Likewise, the 1936 Griffith will provides that the net income of the trust shall be paid to the "ASSOCIATION FOR IMPROVING THE CONDITION OF THE POOR * * * and be devoted by it to special cases of poverty and sickness."

The 1939 Adler will directs that two-twelfths of the net income shall be distributed to "the Charity Organization Society of New York, or its successors" and that the Charity Organization and the other charitable beneficiaries allocate specific percentages "as nearly as may be practicable" to, *inter alia*, the blind, the aged and the incurable.

The 1928 Rockefeller (Spelman) will directs that 10% of the net income be provided to The Charity Organization Society of

the City of New York and allows for redirection if the organization ceases to exist, if the income is not needed for the organization's purposes, if the quality of its work deteriorates, or if the necessity of the work is lessened by social conditions prevailing. No provision is made for terminating the distribution if the organization changes its approach, but continues to service the needy.

Thus, it is clear that the various creators of the trusts intended that CSS receive specific distributions. Community Trust, arguably unhappy with mandated allocations, claims that the change in CSS's approach from being a direct provider to one affiliated with community organizations was an "undesirable" change in circumstances. That distinction, however, appears to be virtually meaningless, since there is no claim that CSS has retreated from its overriding purpose of servicing the needy. As a result, the Surrogate reasonably found that Community Trust abused its discretion, since there is no showing that CSS has deviated from its primary purpose.

There is also no support in the record for Community Trust's claim that the Surrogate rewrote—without any legal basis whatsoever—the variance power contained in its Trust Resolution by adding a new requirement that community foundations must make a "finding" before exercising such power. As the Trust acknowledges, all the parties and the Surrogate agreed that the actions of the Distribution Committee must be judged against an "abuse of discretion" standard. However, contrary to the Trust's argument that the Surrogate never found that it had abused its discretion, such finding is implicit in her finding that "the 1971 decision of the Distribution Committee to exercise the variance power against CSS is unsupported."

Nor is there any merit to the Trust's argument that the Surrogate substituted her judgement for that of the Distribution Committee. She merely held the Trust to the clearly enunciated standard set forth in its own Trust Resolution. As the Surrogate aptly noted, "[t]he crux of this dispute is not the method of review or other procedural aspects of the process. It is whether the Distribution Committee, in 1971, after conducting its investigation uncovered sufficient negative information to support the determination that continuation of payments to CSS was undesirable" simply because, instead of continuing as a direct provider, CSS decided that it could be most effective working with existing community-based groups.

The Surrogate's conclusion, that exercise of the variance power should be limited to those situations where "identifiable

negative details" may be offered to substantiate the "undesirability" of continued payments, appears to be an equitable and definable standard. Thus, in a given case, if it were shown that the designated charity, for whatever reason, was no longer carrying out its stated purpose, then a finding of undesirability might be made. Here, however, while designated funding of community-based approaches might be undesirable from the Trust's viewpoint, it cannot be said that such an approach compromises the intention of the trust creators, which is the determinative factor. Consequently, the Surrogate crafted an equitable and workable standard.[2]

█ Community Trust next argues that, since CSS was aware in 1971 that automatic payments would be terminated, this proceeding is time barred. CSS responds that since the repudiation in 1971 was equivocal, the Statute of Limitations has not yet begun to run.

The Court of Appeals has held that CPLR 213 (1), which provides that six years is the applicable Statute of Limitations for an action for which no limitation is specifically provided by law, governs the time period in which an accounting may be demanded against a trust (*Matter of Barabash*, 31 NY2d 76, 80). In order for the statute to be triggered, however, "mere lapse of time is not sufficient, but an act of repudiation is necessary" (*id.*, at 80). In *Barabash*, the trustee had indicated that he was not going to provide an accounting, but his counsel then requested documents from and exchanged correspondence with the parties seeking an accounting. The Court found that the actions of counsel were equivocal and fell far short of the clear act of open repudiation required by law. Thus, it concluded, the Statute of Limitations never commenced to run and such defense was unavailable to the trustee (*id.*, at 81).

In a related proceeding, *Matter of Community Serv. Socy. (Laura Spellman Rockefeller Mem. Trust), Salvation Army v New York Community Trust* (259 AD2d 289), this Court recently upheld the six-year Statute of Limitations in dismissing similar claims brought by the Salvation Army. In so ruling, the Court found that the documentary evidence had alerted the Salvation Army that automatic payments were being terminated, and also noted that, for some 25 years subsequent

---

2. It also cannot escape attention that, as noted by the Surrogate, when Dr. Scheidlinger inquired about the Prince Trust contributions to CSS, that Community Trust immediately retreated from its decision to terminate the designated payments and did not even advise Dr. Scheidlinger that it had intended otherwise.

to receipt of notice, the Salvation Army failed to litigate the termination.

There, the Surrogate had originally found, prior to the completion of discovery, that the claims of CSS and the Salvation Army were only barred beyond the six-year period. After further discovery, however, upon Community Trust's motion to renew against the Salvation Army, the Surrogate concluded that there had been letters back and forth between the Salvation Army and the Trust indicating that the Salvation Army was aware that there had been a complete repudiation.

Insofar as CSS is concerned, similar correspondence has not been demonstrated to exist, and hence the Surrogate concluded that the repudiation was not absolute, particularly in view of the continuing grants received by CSS. Yet, Reverend James Emerson, the General Director of CSS in 1971, testified at trial that there came a time when he was advised that there would no longer be automatic payments made to CSS, although he was informed "there would be a different process by which payments would be made available." He understood that the new approach was "focusing on the actual individual programs and not just on the general goodwill of the agency." He was not advised that there would be a change in relationship, just a change in process. On cross-examination, however, he responded affirmatively when asked whether he had been told "there would no longer be automatic gifts, but New York Community Trust would have to make specific proposals."

In the face of such an acknowledged understanding by CSS's General Director, it is evident that Community Trust's repudiation of the designated payments, which constituted any and all interest it had as the beneficiary of the trusts in issue, had clearly been conveyed to it. As noted by the Surrogate in her June 7, 1996 decision, "[t]he periodicity of the repudiated obligation would not change this result" (citing *Lamontagne v Pension Plan of United Wire, Metal & Mach. Pension Fund*, 869 F2d 153, *cert denied* 493 US 818).

Thus, despite the Surrogate's finding that Community Trust gave mixed signals, indicating that the automatic payments would be terminated but that the continued preferential treatment given to CSS in the review of grant applications had somehow "muddled the message of an otherwise clear repudiation," there is no basis for her conclusion that any claims within six years of the commencement of the proceeding were not time barred.

The Surrogate's finding, that the Trust failed to notify CSS that its 1971 action "abrogated any special relationship" be-

tween them so that CSS was relegated to the position of any other charity seeking discretionary funds, is belied by the fact that, for purposes of this proceeding, the only relationship, special or otherwise, that CSS had with Community Trust was as the beneficiary of specific bequests which were channeled through Community Trust. Once that relationship ended, CSS was no longer the recipient of legally enforceable entitlements, but became instead a supplicant dependent upon Community Trust's benevolence. As the Surrogate aptly noted in her June 7, 1996 decision: "Notification of a change from automatic distributions to discretionary distributions cannot be considered a mere change in procedure because discretion is the antithesis of entitlement."

Additionally, since CSS was engaged in the subsequent grant application process for over 20 years, its actions indicated that it clearly was aware of its change of status. Thus, all of its claims are time barred, since there does not appear to be any reason to distinguish between the more recent claims and those in the prior years. Either CSS had notice of the repudiation or it did not. Since it clearly did, its claims, like those of the Salvation Army, should be dismissed.

In light of our finding that the matter is now time barred by virtue of the Statute of Limitations, the laches question is rendered moot.

Finally, in a further attempt to circumvent the Statute of Limitations, the Attorney General urges that this Court "should impose an affirmative requirement for effective notice to the Attorney General, to ensure that the basic fairness inherent in judicial proceedings is not absent from the unilateral variance power's extrajudicial alternative." He claims that this authority can be derived from the breadth of his charitable enforcement authority, noting that when charitable corporations seek to release restrictions after donors' deaths, they must petition the Supreme Court upon notice to the Attorney General pursuant to Not-For-Profit Corporation Law § 522 (b).

In this case, however, Community Trust explicitly possessed the variance power pursuant to the terms of the Trust Resolution. While nothing prevented it from notifying the Attorney General, there is no requirement at law to do so. Furthermore, while unnamed individuals might ultimately be the beneficiaries of the funds channeled to CSS by Community Trust, the fact remains that the designated recipient under the trusts at issue was CSS, to which Community Trust gave notice.

In the absence of a specific requirement, this Court declines to impose one. As a designated beneficiary, CSS, the Salvation

Army, or any other charitable organization has the right and wherewithal to challenge a trustee's determination to exercise the variance power. If there were no specifically designated beneficiaries under the wills, and Community Trust had chosen to redirect its distributions from the poor in New York to some other charitable purpose, the Attorney General would probably have standing on behalf of the unnamed beneficiaries. Here, however, no such void exists. The Attorney General's request that this Court craft a notice requirement would be better directed to the Legislature.

Accordingly, the decree of the Surrogate's Court, New York County (Eve Preminger, S.), entered November 9, 1999, which, insofar as it held that the Statute of Limitations did not bar the claims of the Community Service Society of New York within the six years prior to the commencement of the proceeding and that the doctrine of laches did not bar such claims, directed the New York Community Trust and Chase Manhattan Bank to judicially settle their accounts as trustees of five trusts (the Rockefeller trusts) and directed the Community Trust and Bankers Trust Co. to judicially settle their account as trustees of a sixth trust (the Griffith trust), for the period running from October 13, 1989 to the date of the decree, should be modified, on the law, to dismiss the petition as time barred and, as so modified, the decree is otherwise affirmed, without costs. The appeal from the decree, same court and Surrogate, entered August 13, 1996, should be dismissed, without costs, as subsumed within the cross appeals from the decree entered November 9, 1999.

WILLIAMS, J. P., WALLACH, LERNER and SAXE, JJ., concur.

Decree, Surrogate's Court, New York County, entered November 9, 1999, modified, on the law, to dismiss the petition as time barred, and otherwise affirmed, without costs. Appeal from decree, same court, entered August 13, 1996, dismissed, without costs, as subsumed within the cross appeals from the decree entered November 9, 1999.